## STATE LIFE INS CO v RITZI

Ohio Appeals, 7th Dist, Mahoning Co
Decided March 31, 1931

Kennedy, Manchester, Ford, Bennett &
Powers, Youngstown, for Ins Co.

Henderson & Haynes, Youngstown, for
Ritzi.

he was securing by the exchange.

It is claimed that the plaintiff can not now assert the misrepresentation by the defendants because he failed to avail himself of the opportunity to examine the record or look at the abstract which would have disclosed the true situation. This contention is not sound, because defendants made an express representation of a material fact affecting the value of the property for which plaintiff was trading.

The rule is well stated in Martin v Hutton, (Neb) 36 L.R.A. N.S. 602:

"A person is justified in relying on a representation made to him in all cases where the representation is a positive statement of fact, and where investigation would be required to discover the truth."

And the relief may be granted although the misrepresentations knowingly made as to a material fact were not made with actual fraudulent intent.

As stated in 6 O. Jur. 494:

"False representations by a purchaser, of matters of fact of which he is bound to know the truth, will justify the rescission of a sale made in reliance on such representations, although they were not made with an actually fraudulent intent."

Citing **Gallipolis Furniture Co v Symmes** 19 O.C.C. 659.

**Parmlee v Adolph 28 Oh St 10; Aetna Insurance Co. v Reed, 33 Oh St 283; King v Hopkins, 13 O.C.C. 305,** which latter case the note at the bottom of the text discusses.

We are therefore of opinion that the plaintiff has established all the material averments of his petition necessary to the relief sought, and it will therefore be granted as prayed, excepting that portion of the prayer which asks for the appointment of a receiver, upon which at this time we express no opinion.

ALLREAD, PJ, and KUNKLE, concur.

## DE LUXE CAB CO v BRADFORD

Ohio Appeals, 8th Dist, Cuyahoga Co
No 11490.  Decided Mar 16, 1931

McConnell, Lind, Blackmore, Cory & Griffith, Cleveland, for Cab Co.

Young, Meyers & Young, Cleveland, for Bradford.

SHERICK, PJ, LEMERT & MONTGOM-ERY, JJ (5th Dist) sitting

SHERICK, PJ.

In this Court it is insisted that error has intervened in the trial of this case in that the verdict is excessive. After a consideration of all the evidence introduced in this case, we are unable to find that there is any merit in this claimed error.

It is next charged that the court erred in its general charge to the jury in that the court said to the jury: "The degree of care on the part of the Taxicab Company was the highest degree of care. The degree of care on the part of the passenger was ordinary care and skill." It is claimed that this is a repetition in the charge of the degree of care imposed upon the defendant company and that the question of contibutory negligence was not an issue in this cause and that, therefore, it was improper to say to the jury that the passenger was only liable for ordinary care and skill, and that this was a comparison of the degree of care imposed upon the parties to this suit.

There can be no question that this portion of the charge as given is a correct statement of the law and we do not think that it is such a repetition as could or did in any way work to the prejudice of the defendant company, and it in no way increased the burden imposed upon the defendant company.

Coming now to the main ground of error advanced for a reversal of this cause, it appears that the plaintiff to maintain the issue on her part offered as a witness one Dr. Sellman. This witness appeared in court without subpoena and upon cross examination it was developed that the Doctor had in his office a certain card or notation pertaining to the history of the plaintiff's ailment. It must be remembered that Dr. Sellman was not the physician attending the plaintiff at the time of injury, but he seems to have been called upon some few months before the trial of this case, perhaps six to a dozen times. The physician attending the plaintiff having died before this action came on for trial.

As pereviously suggested, it was made to appear that the Doctor had some history of the plaintiff's case and that at the time the Doctor left the witness stand, it was stated by defendant's counsel that he wished to see this history and that he desired the Doctor to bring the same into court. To this the Doctor in open court made a reply that he had already wasted more time than he could spare and that he did not intend to return into court, but the defendant might have his notes pertaining to the plaintiff's case, if he so desired, and the witness left the stand and the court room.

It appears that at various times thereafter in the trial of this suit, the defendant's counsel called for a return of this witness to the stand, for the purpose of a further cross examination, and that the course of the trial was delayed, perhaps in all thirty minutes, but that the Doctor did not make a second appearance.

The defendant's counsel made a like and

futher demand before argument, and it was agreed that he might be placed upon the stand if he should return before argument was completed, and it appears that before the defense made its final argument, that it moved the court for the withdrawal of a juror and the continuance of the cause, and this motion the court overruled.

It is claimed by reason of the defendant's inability to further cross examine the plaintiff's witness, and by the court's action in its overruling of the motion as made that error intervened to the prejudice of the defendant. It will be remembered that this witness was not under subpoena and it is noted that the record is silent concerning any motion of the defense for a withdrawal of the Doctor's testimony from the jury, and it is also silent and does not disclose any request made of the court for an order of the court requiring this witness to remain in court after he had concluded his testimony.

It appears from an examination of the record that there was a substantial cross examination of this witness. He did not testify from his memorandum or any other paper, and it appears to this court that the defendant had a remedy. He could have asked the trial court to impose an order upon the witness to secure this memorandum and await the call of the court. This the Company did not do.

It also appears to us in such circumstances that under §11501 and §11503 GC the defendant could have caused to be issued a subpoena for this witness, for the purpose of further cross examination and this the defendant did not do, although ample time was available for that purpose, and we do not now recognize any failure of duty on the part of the trial court to issue a capias for this witness. Had he been under subpoena, no doubt the trial court would promptly have caused the reappearance of this witness in court. But the witness not being under subpoena and having retired, the obligation was not imposed upon the plaintiff to procure his constant attendance

It is, therefore, the judgment of this court that there is no merit in this claimed ground of error.

There being no further errors advanced as to why this judgment should be reversed and holding the views as herein previously announced, the judgment of the trial court is hereby affirmed.

LEMERT and MONTGOMERY, JJ, concur.

**CONRAD v RAREY**

**LEHMAN v SMITH**

Ohio Appeals, 2nd Dist, Franklin Co
Decided Feb 10, 1931

H. J. Gardner, Columbus, for plaintiffs.
C. E. Smith, Columbus, for defendants.

ALLREAD, J.

The defense raises two questions; the first is as to whether Florence Conrad can, in view of her having assumed the mortgage claim of the Union Trust Company, resist the mortgage given to secure said mortgage.

We do not find it necessary to determine this question.

We go to the second defense, which is the principal question, namely, as to the right of C. E. Smith, as Trustee for the Union Trust Company, to recover judgment in view of the failure of the Union Trust Company to comply with the provisions of §178 GC, et seq.

The findings of fact do not show the character or amount of business done by the Union Trust Company in Ohio.

The findings of fact are open, therefore, to interpretation as to the nature and amount of business done in Ohio.

The claim being here for the forfeiture of the mortgage deed, we hold that the courts are bound to construe the findings of fact in connection with the facts admitted in the pleadings most strongly in favor of the Union Trust Company.

So construing the findings of fact we are satisfied that there is no showing of any such violation of the Ohio law as to justify the refusal of relief to C. E. Smith, as Trustee for the Union Trust Company, or to the company, itself. This, we think, is justified by the decision of our Supreme Court in **Soap Co. v Bogue, 114 Oh St 149,** and in the still later case of **List v Co-Operative Association, 114 Oh St 361.** In the latter case the facts are more clearly

similar to those in the present case, and it was held as follows:

"1. Where the laws of this state authorize corporations to be formed for the purpose of carrying on a certain prescribed business, corporations organized under the laws of other states for similar purposes may by virtue of the same authority operate within this state, upon compliance with the provisions relative to registration of foreign corporations.

2 Acts of such foreign corporation within this state prior to registration within the limitations permitted by the laws of this state are not void."

There is a still later case, to-wit, that of **Eversman v Chapman, 115 Oh St 269,** which goes still further in holding that a foreign corporation may transact business within this state notwithstanding its default in compliance with the Ohio laws, and that such acts are not void for that reason.

See also **The Harriman Natl. Bank of N. Y., Trustee, v Boulevard Co., 25 N.P. N.S. 263,** affirmed by Court of Appeals, 22 O.L.R. 648.

Counsel also quote the failure to comply with §5508 and §5509 of the Revised Statutes. The first section relates more especially to insurance corporations transacting an insurance business, but the latter section applies to all corporations doing business within this state. In the pleadings it does not appear that these sections of the statute are referred to, but they are referred to in the briefs of counsel. In the absence of such pleading, we think it is not necessary for us to consider the effect of these statutes, but even if we were, we think as against a corporation which has failed to comply with §178 GC and such corporation does not transact any business in this state which offends against the other sections, that these sections do not apply.

We are, therefore, of opinion that the judgment of the Court of Common Pleas in this case is correct.

In the Lehman case, we are of opinion that the views already expressed in the Conrad case are conclusive as to the judgment rendered. There are, however, other questions in this case. It appears that Athens L. Lehman filed his answer to the petition setting up the fact that the Union Trust Company of Baltimore, Maryland was doing business in Ohio without complying with §178 GC, and that by reason thereof the mortgage could not be enforced.

This answer was filed on November 22, 1928.

On July 29, 1929, an amended petition

was filed which was a re-statement of the entire cause of action.

On the same date a receiver was appointed to collect rent.

On October 10, 1929, an order of foreclosure was entered on the evidence. A sale was then advertised and the property sold. On November 25, 1929, a moton was filed to set aside the judgment upon the ground that there was no default.

On November 26, 1929, a motion was filed by the plaintiff showing that Athens L. Lehman had transferred his interest in bankruptcy and asking that his trustee in bankruptcy should make the claim.

Both motions were overruled and the judgment was entered **nunc pro tunc.**

We are clear that there was no error in this case, and that for the reason stated also in the Lehman case, the judgment must be sustained.

HORNBECK and KUNKLE, JJ, concur.

## BAIR v CLEVELAND (City)

Ohio Appeals, 8th Dist, Cuyahoga Co

No 11478. Decided March 16, 1931

Frank S. Day, Cleveland, for Bair.

Harold H. Burton, Stephen Gobozy and Norman A. Ryan, all of Cleveland, for City.

SHERICK, PJ, LEMERT & MONTGOMERY, JJ, (5th Dist) sitting.

SHERICK, PJ.

Having in mind the rule announced by the Supreme Court in the case of **Cooper v State of Ohio, 121 Oh St 562,** we have reviewed this testimony and it is the opinion of this Court, in view of the fact that there is no conflict in the testimony, that there is sufficient reasonable and competent evidence to support the judgment of the trial court. It is not for us to determine, in view of the state of this record, wherein the probable truth lies as there is no conflicting evidence, and we do find that there is such evidence as is sufficient to support the judgment by that degree of proof which the character of the case requires; that is, from the evidence we are unable to say that the testimony in this case does not warrant the judgment, and that the evidence is of such a character as to establish the proof of the defendant's guilt beyond a reasonable doubt.

Our attention has been further called to the fact that the defendant did not offer himself as a witness and we believe that the trial court was warranted in considering this fact along with the evidence intro-

duced in the trial of this case, and we agree with the Court in the case of **Vecchio v the State of Ohio, 32 O.L.R. 553,** that it is proper for a court to consider the failure of the defendant to take the stand in his own behalf as substantial evidence of his guilt. His failure to speak when opportunity is open to him is surely some evidence of the probable truth of the accusation placed against him.

It is therefore the judgment of this Court that there is no error in this record, and that the evidence fully warrants the judgment of conviction. We have examined the other grounds of error alleged in the petition in error and find that no errors prejudicial to the rights of the plaintiff in error have intervened.

The judgment of this court therefore is that the judgment of the trial court be affirmed.

LEMERT and MONTGOMERY, JJ, concur.

## COMBS v KENNEDY

Ohio Appeals, 2nd Dist, Franklin Co

No 1906. Decided Feb 26, 1931

F. S. Monnett, Columbus, for Combs.

George R. Hedges and Charles Case, Columbus, for Kennedy.

KUNKLE, J:

We have considered the petition of the plaintiff in error and also the briefs filed by counsel. Upon such consideration, we are of opinion that the demurrer was properly sustained by the lower court and that the petition of plaintiff in error fails to state a cause of action.

We think the case of **Copin v Greenlees, 38 Oh St 275,** is controlling. The syllabus of this case is as follows:

"An executory agreement between a manufacturing corporation of this state and one of its stockholders, for the purchase of the stock of such corporation, by the former from the latter, cannot be enforced either by action for specific performance or for damages."

Other Ohio decisions are to the same effect. Counsel for plaintiff in error, among other authorities, stress the decision of the Circuit Court of this district in the case of **Siders v The Gem City Concrete Company, 13 O. C. C. N. S., 481.** We are of opinion that this case can be distinguished from the case at bar. A study of this case satisfies us that it really turned upon paragraph 6 of the syllabus, namely:

"A corporation which has purchased its own stock and given a note in payment, and thereafter sells the stock, is estopped from setting up the defense of want of power to make such purchase."

The principle of estoppal is not present in the case at bar as in the above cited case. We do not think the petition discloses a trust as to the funds in question.

Finding no error in the record which we consider prejudicial to plaintiff in error the judgment of the lower court will be affirmed.

ALLREAL, PJ, concurs, (HORNBECK, J, concurs in judgment.)

## SWANINGER v GERSTNER

Ohio Appeals, 2nd Dist, Montgomery Co
No 1034. Decided Feb 17, 1931

Davisson, Davisson & Sheridan, Dayton, for Swaninger.

Shively & Holmes, Dayton, for Gerstner.

KUNKLE, J:

Counsel have favored the Court with very exhaustive briefs in which many authorities are cited and discussed. We shall not attempt to review the authorities so cited, but will merely announce the conclusion at which we have arrived after a consideration of the authorities.

It will be noted that in the case at bar, there has been no eviction, nor even threatened eviction from the premises in question. It will also be observed that there is no averment in the petition to the effect that anyone is asserting or claiming a superior title to the property in question.

In **11 Oh Jur** at page 925, the rule is very succinctly stated as follows:

"It seems well established that no breach of the covenant of warranty occurs by reason of an outstanding title, until there is some hostile assertion thereof to which possession is yielded or which is purchased in. It is not broken until the grantee, his heir or assignee is evicted or disturbed in the enjoyment of the premises by a superior title. Thus, the existence of an outstanding title, which is a cloud upon the grantee's title, but which was never asserted against him and which he never recognized or yielded to, nor was even threatened with an eviction or proceedings of any kind by the holder of such outstanding title, which subsenquently is voluntarily released by the holders thereof upon the request of the grantee, does not constitute a breach of a covenant of warranty. But it is not necessary that the paramount title be established by judgment or decree. What the law requires is that such title be in effect paramount to that under which the grantee or his successor in interest holds, and that there be a yielding to the assertion of such title."

In **24 Oh St 542**, the first paragraph of the syllabus is as follows:

"Where a person owning an estate in lands for the life of another executes a deed with the covenant of seizin purport-

ing to convey the lands in fee simple, and the purchaser is put in possession under the deed, such covenant, in view of its settled construction in this State, is not broken until eviction or its equivalent."

We recently had occasion to pass upon a case somewhat similar to the case at bar and are therefore familiar with the holdings in Ohio upon this general subject. We refer to the case of Millison v Drake in the Court of Appeals of Franklin County, Ohio, and which case is now in the Supreme Court. Its determination by the Supreme Court may be of interest to counsel.

We have considered all the grounds of error urged by counsel for plaintiff in error in their brief and upon such consideration are clearly of opinion that under the Ohio decisions the petition fails to state a cause of action, and the demurrer was therefore properly sustained. Judgment affirmed.

(ALLREAD, PJ, and HORNBECK, J, concur).

## ALEXANDER v STATE

Ohio Appeals, 2nd Dist, Miami Co

No 267. Decided Feb 13, 1931

W. A. Haines and W. H. Gilbert, both of Troy, for Alexander.

L. E. Harvey, Bradford, and F. C. Goodrich, Troy, for State.

**BY THE COURT:**

The plaintiff in error, by motion and otherwise, throughout the trial, raised the question that the affidavit did not state an offense against the plaintiff in error. The contention of the plaintiff in error is that the children in question must be found delinquent before an offense is established, and that the testimony in this case did not show such delinquency.

Much of the brief of counsel for plaintiff in error is devoted to an argument of this proposition.

From a consideration of the statute in question, and of the authorities, we are of opinion that the motion to quash was properly overruled. It is not claimed that these children were delinquents; the charge in the affidavit under the statute is that the conduct of plaintiff in error tended to cause the delinquency of such minor children. We think the affidavit charges an offense.

We are also of opinion that the record

contains evidence, particularly that of the children themselves, which, if believed by the jury, warranted the jury in finding the plaintiff in error guilty as charged.

We find no error in the charge of the trial court nor in the refusal to charge as requested, which we consider prejudicial to plaintiff in error.

We have considered all of the grounds of error urged by counsel for plaintiff in error in their brief but finding no error in the record which we consider prejudicial to plaintiff in error, the judgment of the lower court will be affirmed.

## HEFFNER v ZEIER

Ohio Appeals, 2nd Dist, Franklin Co

No 2004.    Decided Feb 25, 1931

L. P. Henderson, Columbus, for Heffner.
Charles S. Best, Columbus, for Zeier.

### THE FACTS ARE STATED IN THE OPINION.

BY THE COURT:

This case is submitted upon the motion filed by the defendant in error to strike the Bill of Exceptions from the files. It appears from the record that the motion for new trial was overruled on the 5th day of December, 1930. The Bill of Exceptions was not filed with the Clerk until it was allowed on January 24, 1931. This was more than 40 days after the motion for new trial was overruled. Counsel for defendant in error insist that the Bill of Exceptions was not filed within the time allowed by the statute and is, therefore, invalid. We have carefully considered this question. Under the old law the Supreme Court was consistent in holding that the Bill of Exceptions must be allowed within the time prescribed by statute. The decisions of the Supreme Court to this effect are: **Young v**

**Shallenbarger, 53 Oh St, 291; Newman v Becker, 54 Oh St, 323; Long v Newhouse, 57 Oh St, 349.**

The first case decided after the amendment to the statute requiring a Bil lof Exceptions to be filed with the Clerk of the Courts within 40 days after the motion for new trial was overruled was the case of **Davies v Railway Company, 71 Oh St, 329,** in which it was held that it is the duty of the party desiring to take a Bill of Exceptions to file the same in the cause with the Clerk of the Court within 40 days after the overruling of the motion for new trial, or the decision of the Court excepted to where a motion for new trial is not filed, and having done this he has performed all the duties imposed upon him by the statute. This case in connection with the case of **Pace v Volk, 85 Oh St, 413,** to the same effect makes it the duty of the litigant who desires to take a Bill of Exceptions to file the same with the Clerk of the Court within 40 days after the overruling of the motion for a new trial, or in case such motion is not filed within the same time after the decision of the Court to which objections are made.

The Supreme Court in the still later case had up the question of the filing of a Bill of Exceptions in the case of **State ex rel Anderson v Spence, et al, Judges, 94 Oh St, 252,** in which the same holding was made in a mandamus case against the Judges of the Court of Appeals.

In the case of **Porter v Rohrer, 95 Oh St, 90.** it was held that:

"While the excepting party is bound to file with his petition in error a Bill of Exceptions if he desires to raise the questions necessary thereby, but in a case where the excepting party has performed the statutory duty required of him he is not bound to file such Bill of Exceptions where the Trial Judge, through some fault of his, fails to sign the Bill of Exceptions but may bring it up to the higher Court within due time after the Bill is filed."

It, therefore, appears that the Supreme Court has held the excepting party to the duty of filing his Bill of Exceptions within the prescribed 40 days and that there is no power to allow the excepting party any variation from this date. It is claimed, however, that by virtue of 11,569 GC, the trial judge may allow an additional time of 15 days for the Judge to consider the Bill of Exceptions and allow it. This is required to be entered upon the Bill of Exceptions by the Trial Judge. It is claim-

ed that this section of the statute would extend the time for the original filing of the Bill. We are unable to agree with counsel upon this proposition. The decisions of the Courts are to the effect that the filing of the Bill of Exceptions within 40 days, as provided in §11564 GC, is mandatory and we find no provision which would justify counsel in failing to file his Bill of Exceptions with the Clerk of the Court within that time. See **Newman v Becker,** supra. Counsel refers to the case of **Beebe v State ex rel, 106 Oh St 75.** We find, however, that this relates to the extension allowed by §11569 GC to enable the Trial Judge or Judges to sign the Bill of Exceptions as provided in §11,564 GC. We, therefore, reach the conclusion that the failure to file the Bill of Exceptions with the Clerk of the Court within the 40 days allowed by §11,564 GC is a fatal defect and as it is mandatory we reach the conclusion that the motion should be sustained.

We have read the briefs of counsel for plaintiff in error to the effect that he relied upon the official stenographer to file the Bill and then when a copy thereof was placed in his hands within the time for filing it in the Court of Common Pleas he assumed it was a copy for his benefit and did not file the same although he then had several days' time within which to file it. We reach the conclusion that inasmuch as the statute places this duty upon the party who objects to the decision of the Court of Common Pleas that he has no right to rely upon the official stenographer to file the Bill of Exceptions. He must, at his own peril file the Bill within the time prescribed.

The motion of the defendant in error must, therefore, be sustained.

(Allread, PJ, Hornbeck and Kunkle, JJ, concur.)

### CUNNINGHAM v STATE

Ohio Appeals, 4th Dist, Athens Co
Decided March 11, 1931

Jones, Jones & Erskine, for Cunningham.
John W. Bolin, Pros. Atty., Athens, for State.

**THE FACTS ARE STATED IN THE OPINION.**

MIDDLETON, J.

The plaintiff in error was convicted by a jury in the Court of Common Pleas under an indictment containing three counts charging violations of §12646 and §12649 GC. The case was submitted to the jury under all of said counts and a general verdict of guilty was returned against him. No demand was made on the court to direct the state to elect upon which count or counts the case should be submitted to the jury and no exceptions were taken to the submission of all of the counts to the jury.

The defendant is complaining here of some errors which he maintains intervened to his prejudice in the trial of the case. He contends, first, that there was no proof that any of the things complained of were injurious to the health of the public. It is a sufficient answer to say that this contention may only apply, if at all, to the first count in said indictment, and as to that count it was not necessary for the state to show that the thing complained of actually affected the health of the public or any part of it. It is sufficient under that count to show, as charged therein, that it was injurious to the comfort of the people living in the vicinity of the alleged nuisance. A further rule should be observed, which is that the indictment having contained three counts, and the verdict of the jury being a general one finding the defendant guilty under all of said counts, it is sufficient if the record properly shows a conviction under only one or more of said counts.

Some further complaint is made of the failure of the trial court to give two special instructions to the jury which it is claimed were requested to be given before argument We have carefully examined the record and are unable to find any trace of the two instructions claimed to have been so requested or of any refusal of the court to give such instructions or any exceptions by the defendant to the refusal of the court to give the instructions claimed to have been requested either before argument or after argument or in the general charge of the court. Moreover, we are convinced that if the record did sufficiently show that such instructions were requested they were properly refused for the reason that they were not pertinent to a case of the kind then being tried.

Another complaint goes to the admission of the testimony of an official stenographer, who for the purpose of impeaching

a witness referred to her notes taken before the grand jury and read to the jury a part of the record she then made. The competency of evidence of this kind has been established by the courts generally and is directly approved in several reported cases, among which may be mentioned the case of **Baum v State,** 6 O. C. C. (n.s.) 515.

The verdict of the jury in this case was proper and the judgment which followed must be affirmed.

MAUCK, PJ, and BLOSSER, J, concur.

## EDGE v STUCKEY

Ohio Appeals, 4th Dist, Ross Co

Decided March 11, 1931

Maddox & Maddox, Washington C. H., for Edge.

John P. Phillips, Washington C. H., for Stuckey.

BY THE COURT

It is suggested in one of the briefs of the defendant in error that the doctrine in **Metzger v Ziesler,** 13 N. P. (n.s.) '49, and **City of Cincinnati v Archiable,** 4 Oh Ap, 218, should be followed, to the end that a judgment can not be opened up during term except under the conditions set forth in §11631 GC. That doctrine, which is elaborated in the Archiable case, has been repudiated by the Supreme Court in **First National Bank v Smith, 102 Oh St 120.** The Smith case went to the Supreme Court on certificate from the Court of Appeals of Allen County, which court expressly refused to follow the Archiable opinion. Under the doctrine of the Smith case it is apparent that the trial court had power to set aside the judgment complained of in this case, and we are only concerned now with whether or not that court abused its discretion in refusing to open up the judgment. It did so abuse its discretion if the very timely application made by the defendant was accompanied by a showing that in good faith the defendant was ready to interpose an adequate defense.

The defendant swears that he had on deposit in The Ohio State Bank at Washington C. H. a considerable sum of money; that he knew that that bank was in a precarious condition and would not have kept that deposit there except that he thought that he could use the deposit as an offset in case the bank failed against what he owed the bank on the note sued upon in this case. He says that the plaintiff is an officer of The Ohio State Bank, and in cooperation with other officers of the bank caused him to believe that this note was owned by the bank at different times when the note had been renewed in the year previous to May, 1930, when the bank failed, by causing such renewals to be made in the name of the bank. This is equivalent to saying that the plaintiff, who claims to have become the owner of the note in April, 1929, deceived the defendant or caused others to deceive him into believing that the bank, and not the plaintiff, was the holder of the defendant's note and thereby secured the deposit which he had in the bank at the time the bank failed. If these claims are true they would not necessarily defeat the plaintiff's title to the note but they would entitle the defendant to the setoff which he would have had against the bank if the bank had been the owner of the note at the time the bank failed. Equity would perhaps require him, to make an assignment of his deposit to the plaintiff as a condition upon which he would secure the setoff. While no such assignment is pleaded or tendered in the answer the pleading makes an equitable defense, and it was within the power of the trial court to protect the rights of both parties as the facts might warrant.

While we have referred to the affidavit in this case as an answer it is not an answer, and when the case goes back to the Common Pleas the defendant is not limited in his answer to the precise allegations

that appear in the affidavit which he calls an answer.

The judgment and order of the Common Pleas is reversed and the case is remanded to that court with direction to vacate the judgment and permit the defendant to answer.

MAUCK, PJ, MIDDLETON and BLOSSER, JJ, concur.

## FISSELL v MORRIS

Ohio Appeals, 4th Dist, Pickaway Co

Decided Dec 26, 1930

Charles Dresbach, George G. Adkins, and Tom A. Renick, all of Circleville, for Fissell.

Barton Walters and C. A. Weldon, both of Circleville, for Morris.

BLOSSER, J.

The question for our determination is whether under the laws of Ohio a surviving partner can maintain an action in the Court of Common Pleas for an accounting in a partnership dissolved by the death of one of the partners. The decision of this question involves the construction of §8085 to §8091 GC. §8085 GC provides:

**"Duties of Surviving Partner.**

When a member of any partnership in

this state dies, the surviving partner or partners upon the appointment of an executor or administrator of the estate of such deceased partner, shall forthwith make application to the probate court of the county in which the partnership existed, upon first giving notice of the time of the hearing of such application to the executor or administrator, for the appointment of three judicious, disinterested appraisers, who shall make out under oath a full and complete inventory and appraisement of the entire assets of the partnership including any real estate, together with a schedule of the debts and liabilities thereof, and deliver it to the surviving partner or partners, to be by him or them forthwith filed in the probate court of the county in which such appraisers were appointed."

The sections immediately following provide the procedure under which a surviving partner may purchase the interest of the deceased partner, the giving of bond and the appointment of a receiver to wind up the business of the partnership in accordance with the statutes governing receivers.

Sec 8085 GC provides that the appraisers shall make out a complete inventory and appraisement of the entire assets of the partnership. If the deceased left a large amount of money which was not profits such net profits would necessarily be partnership assets and should be appraised as such. The statute also provides that the appraisers shall make out and file a schedule of the debts and liabilities of the partnership. It would be the duty of creditors to file their claims. The plaintiff avers that the partnership had no debts. This is a matter about which he could not know. This assertion was a mere matter of surmise or conjecture. It could not be ascertained what debts there were until some one was appointed with whom the claims could be filed. The mode of procedure mapped out by the statute is full and complete to give the plaintiff ample relief and a full opportunity to have his claim adjudicated. The provisions of §8085 GC are mandatory and exclusive. The Probate Court has complete jurisdiction and full authority to adjudicate the rights of the parties in this case. The jurisdiction of the Probate Court was invoked and had control over the estate of William W. Miller.

The rule is well expressed by our Supreme Court in the case of **Dwyer v Carlough, 31, Oh St 159**, as follows:

"Where a court of competent jurisdiction has acquired possession of the subject matter of litigation, and the right of the party to prosecute his action once attaches, the right of the court to retain the case and the party to prosecute it can not be defeated by the institution of proceedings in another court altho of concurrent and coordinate jurisdiction."

The Probate Court, having taken jurisdiction of the affairs and settlement of the estate of William W. Miller, will continue to have such jurisdiction until the estate is finally settled.

The courts of Ohio support the construction which we have placed upon §8085 GC, **Duvall v Faulkner, 113 Oh St 543.** In the opinion in **Insurance Co. v Carnahan, 19 C C. 98**, the third syllabus is as follows:

"Section 5167 R. S., as amended and now in force, provides for the manner in which partnerships on the death of one of the partners shall be wound up, and is exclusive of any rights which the surviving partner may have had under the common law. in such cases."

At page 105 of the opinion the court said:

"But since the last amendment providing for a receiver it would seem that the legislature intended to provide an exclusive means for winding up the affairs of a partnership. It is certainly very doubtful whether in Ohio a surviving partner has such right in closing up the affairs of a partnership as he had at common law."

In the case of **Weitz v Weitz, 15 Oh Ap 135, at page 145**, the court in the opinion among other things said:

"The code provides for a complete settlement of the partnership business if the surviving partner takes the partnership property at the appraisement. In case he refuses or neglects to take the partnership property a receiver is appointed, who must proceed to wind up and dispose of the assets in accordance with the statute governing receivers. The Probate Court is given complete jurisdiction to appoint and control the receiver. It is evident that the legislature intended to confer on the Probate Court jurisdiction, upon the death of one of the partners, to settle the partnership business."

To the same effect is **Anderson et al v Insurance Co., 22 Oh Ap 209.**

Counsel for the executor have cited other cases in support of their contention that the Court of Common Pleas is without jurisdiction. It is true, as pointed out in the

able brief of counsel for the plaintiff in error, that these cases were not based upon the exact facts of the instant case. Nevertheless the principle of law laid down in all' of these cases is to the effect that the statute, having provided a remedy for the settlement of partnership affairs, is exclusive.

For the reasons above stated the Court of Common Pleas was without jurisdiction to entertain the case and the suit was properly dismissed.

Counsel for the defendant in error urge another reason why the judgment of the court below should be affirmed. The executor in the second defense of his answer alleges in substance that soon after the death of the decedent and the appointment of the executor, the plaintiff having full knowledge of all his relations with the deceased during the latter's life time and of the partnership business, with the assistance and advice of his legal counsel, prepared, verified and filed with the executor a claim against the estate of the deceased and demanded the allowance and payment of the same; that the plaintiff averred under oath that the entire profits from the fur business were the sole and individual property of the deceased, and at that time set forth and represented that he was a servant and employe of the deceased; that the decedent was indebted to him in the sum of one thousand dollars per year for services; that the executor refused and rejected the claim and notified the plaintiff of the rejection of it as a claim against the estate, and that no action was ever brought thereon; that the claim so filed by the plaintiff was inconsistent with the claim urged in the petition herein, and that the plaintiff is estopped to claim that he is entitled to any share of the partnership assets. The plaintiff in his reply to this defense alleged that the claim set out in the second defense of the answer resulted from the inadvertance, mistake and want of understanding of the facts by the attorney who prepared the claim, and that the plaintiff signed and filed the same without understanding or realizing its effect. It is urged by the executor that under this state of the pleadings the plaintiff is estopped to prosecute his claim and that the executor is entitled to judgment on the pleadings. It is possible that if a trial were had upon these issues and evidence were presented to the court it might be difficult for the plaintiff to succeed. However, it can not be said as a matter of law that an estoppel has been created.

In view of the fact that the Court of Common Pleas was without jurisdiction to entertain the case that court properly dismissed the petition, and for the above reasons the judgment of the lower court is affirmed.

MIDDLETON, PJ, and MAUCK, J, concur.

## C C C & ST L RY CO v KUHL, Admrx

### Ohio Supreme Court

### No 22418.   Decided April 22, 1931

Marshall, C. J., Matthias Kinkade and Robinson, JJ, concur.   Jones J, not participating.

Full opinion will be published later. Watch **Omnibus Index.**

## FIRST NATL BANK v HERMAN

Ohio Appeals, 9th Dist, Summit Co.

No 1839.   Decided Jan. 20, 1931

Loomis & Caris, Ravenna, and Doolittle, Foust & Holden, Akron, for Bank.

Herberich, Weick & Powers, Akron, for Herman.

PER CURIAM:

We have carefully real all of the evidence submitted to us and have given consideration to the questions presented, and we find the facts to be substantially as follows:

On Sept. 28, 1920, the defendants executed and delivered to one Herbert J. Etling a series of promissory notes, aggregating $6,000, and to secure the payment of the same executed and delivered to said Etling their mortgage upon certain real estate.

On the 8th day of December, 1923, after defendants had paid to said Etling all but $3,500 of said notes, and before the notes for $2,500 of said $3,500 were due, said Herbert J. Etling borrowed $1,300 from the plaintiff, and as security therefor endorsed in blank and delivered to plaintiff said notes for $3,500 and the mortgage given to secure the same.

The plaintiff did not notify the defendants that said notes and mortgage had been so pledged, and the defendants did not know that said pledge had been made.

The defendants paid to said Etling the interest due upon said notes for $3,500, and the plaintiff, knowing that Etling was collecting said interest, not as its agent but as the apparent owner of said notes, permitted Etling to collect and retain said interest so long as he paid the interest due upon his note to plaintiff, and in January, 1926, the plaintiff also delivered to said Etling one of said notes for $1,000, which was past due when pledged, with the knowledge that Etling was to collect the same, not as its agent but as the owner thereof, and retain for his own use the principal thus paid.

The defendants not only paid said $1,000 note and the interest on all of said notes, but also from time to time, in good faith, made payments upon said notes to Etling,

on the assumption and belief that he was still the owner of said notes and mortgage; and by Sept. 28, 1928, they had paid to said Etling all that was due upon said notes except $600 of principal.

During all of this time the plaintiff knew that said Etling was, as the apparent owner, collecting from the defendants said interest and retaining as his own the amount thereof in excess of the interest on his loan with the plaintiff, and the plaintiff was charged with knowledge that said Etling held himself out to the defendants as the owner of said notes and that in the usual course of business said defendants were paying or were likely to pay the principal of said notes to said Etling as the owner thereof.

We make no attempt to detail the evidence which leads us to the unanimous conclusion of fact just stated, which we find to be established by clear and convincing evidence.

If the plaintiff desired a change in the methods which had theretofore been pursued and were likely thereafter to be pursued, it was its duty to notify the defendants that it held said notes as pledgee and that the payment of interest and principal thereof should be made to it.

Ordinarily, the pledgee of an obligation which is negotiable is not required to notify the maker that the same is pledged; but where the pledgee has actual knowledge, or the circumstances are such as to charge him with knowledge that the person to whom such obligation was given is holding himself out to the maker of the obligation as still being the real owner of the obligation and is deceiving the maker into dealing with him and paying to him interest and principal as such owner, then there is a duty upon the pledgee to notify the maker of such pledge that the obligation has, ben pledged; and if he fails to do so, the pledgee is estopped from claiming that the payments so made by the maker in good faith and without knowledge of the pledge, should not be credited upon said obligation.

This case differs from the case of **Hoffmaster v Black, 78 Oh St 1,** in that it presents no question of agency. Plaintiff did not authorize or permit Etling to collect either interest or principal as its agent; on the contrary, it knew that Etling was dealing with defendants as the owner of said notes, and delivered to him one of the notes for the very purpose of permitting him to do so. Its conduct constituted a fraud upon the defendants, and it should not be permitted to profit thereby at the expense of the defendants, who were innocent parties in the transaction.

We further find that the defendants of-

fered to pay into court said $600 and interest, together with, the costs of the action up to the time said offer was made, and that said offer was rejected by the plaintiff.

An order may be entered that, upon the payment into court, within ten days, of the amount of said offer, with interest to date of payment, the plaintiff be ordered to cancel its mortgage and surrender the notes secured thereby, or in lieu thereof, the decree to operate as such cancellation and surrender; and that, if the defendants fail to make such payment, the decree to operate as a finding that there is due upon said notes the sum of $600, together with interest from Sept. 28, 1928, and order a foreclosure of the mortgage to collect the same.

FUNK, PJ, PARDEE, J, and WASHBURN, J, concur.

McKINEY v C. C. C. & ST. L. R. R. CO

Ohio Appeals, 2nd Dist, Montgomery Co
No 1028. Decided Jan 15, 1931

Burkhart & O'Brien, for McKiney.
Harry N. Routzhon for R. R. Co.

ALLREAD, J:

Upon the first question we cannot escape the conclusion that the plaintiff was not negligent in the confining of the mules or the caring for them after they escaped from their confinement. It may be true that the plaintiff was not as careful as was possible in the confinement of his mules but after the same had escaped he and his son with diligence followed the mules up and attempted to recapture them. We are of opinion that the evidence does not justify a finding by the court that the plaintiff was negligent. We are, therefore, required to examine the record on the issue as to the negligence of the railroad company in operating its trains.

The claim is made on behalf of the railroad company that the company was not required to fence at the point where the mules got on the track for the reason that there were sidings and public streets and that the use of the sidings and streets would exclude the idea of fencing.

The first case to be considered is Cincinnati & Zanesville Railroad Co. v Smith 22 Oh St, 227. In this case the syllabus is:

"The servants of a railroad company, in operating its trains, are bound to use ordinary care to avoid injury to domestic animals trespassing on the railroad.

Where such trespassing animals were killed by a train, if the servants of the company, having the train in charge, by the exercise of ordinary care, and with due regard to their duties for the safety of the persons and property in their charge could have seen such animals on the track in time to have saved them, it was their duty to have done so and for the negligence in this respect, where the owner is not guilty of contributory negligence, the railroad company will be liable."

In the opinion the Court says:

"The fact that the road was fenced at the place of collision with the horses was a circumstance to be considered in connection with the other circumstances of the case in determining whether the engineer was guilty of negligence in not looking ahead and discovering the danger in time to avoid it, * * * but it cannot be said that the engineer, as a matter of law, by reason of the fences was wholly excused

from keeping a lookout ahead of the train."

If, therefore, the mules were actually trespassers on the right of way and the tracks of the company, they were still entitled to due care on the part of the drivers of the train to avoid injury.

The plaintiff in error claims that he, as. the owner of the mules was entitled to the benefits of a fance along the railway as a protection to his stock.

The case of **Railroad Company v Neubrander** '40 Oh St, 15, was one which involved exceptions to the statute providing for cattle guards. The statute provides for both fences and catle guards and it was held in the Neubrander case that

"The act of April 1874, (71 Ohio Law 85) imposes upon a railway company the duty of constructing, and maintaining necessary cattle guards where ever its road crosses a highway. This statute may be construed as allowing exceptions required by public convenience and necessity and the proper use of a station yard by the company.

When the company is relieved from this requirement, for the above reasons, it is its duty to construct and maintain cattle guards across its roadway and grounds at the first points from the highway which will not interfere with the necessities and convenience of the public and the company.

Whether this has been done is a question to be submitted to the jury in an action against the company for damages."

This is the only Supreme Court case in our state which involves the alleged exceptions to the statute and the cases referred to are reconciled upon the theory that the railroad company is bound to keep a lookout for stock on its right of way and to use due care for their protection and whether the mules were trespassers or not does not justify the negligent operation of the train so as to injure or kill them.

In this case the railroad company must have known that its road was not fenced at the place where the mules entered the right of way. Whether the facts in the present case constitute an exception to the statute or not the company was bound to use due care in view of the fact that its road was unfenced. The evidece therefore presented a question for the jury or the triers of the facts to decide whether the facts were such as to justify such exceptions.

The Municipal Court Judge took the place of the jury in this case. He was authorized to decide the questions of fact as well as the questions of law and there being no special findings of fact the Trial Court decided the entire case, and we are bound to follow the decisions of the court upon the questions both of fact and law, if the evidence would justify such a finding. We think there was enough evidence to justify the finding of the Municipal Court. We are therefore of the opinion that such judgment must be affirmed.

KUNKLE, PJ, & HORNBECK, J, concur.

## C. C. C. & ST. L. RY CO v M. DEGARO CO

Ohio Appeals, 1st Dist, Hamilton Co.

No 3633.   Decided April 14, 1930

H. N. Quigley, C P. Stewart, and Harmon, Colston, Goldsmith & Hoadley, all of Cincinnati, for Ry.

Hightower, O'Brien & Porter, Cincinnati, for DeGaro Co.

ROSS, J:

For convenience we will refer to those involved as follows:

The Perham Fruit Co., Shipper:
Denney & Company, Consignee;
The C. C. C. & St. L. Ry., Carrier; and
M. Degaro & Sons, Purchaser.

The Bill of Lading was a straight bill for an interstate shipment, and, under the Federal Bill of Lading Act, United States Code, Title 49, Chapter 4, section 109, cannot be negotiated free from existing equities, and the endorsement of such bill gives the transferee no additional right.

The purchaser, therefore, by taking up the draft and delivery order, obtained no greater rights than the original consignee; nor did the payment of freight charges confer any right upon the purchaser additional to that possessed by the consignee, especially as all of these acts were performed subsequent to the receipt by the carrier of the notice to stop.

The position of the carrier is, that it was justified in refusing delivery to the purchaser, because previous to actual or constructive delivery to the consignee it had received notice of stoppage in transitu from the shipper, justified by the insolvency of the consignee.

The position of the purchaser is, that the rebilling and diversion at Laramie, Wyoming, from original destination under the instructions of the consignee, was a constructive delivery to the consignee and terminated the transit and the right of the shipper to stop delivery.

"The rights and liabilities of the parties to an interstate railway shipment depend upon Federal legislation, the bill of lading, and common-law rules as accepted and applied in Federal tribunals." Cincinnati, New Orleans & T. P. Ry. Co. v Rankin, et al., 241 U. S. 319; (1917 A. L. R. A., p. 265, syllabus 2).

The common-law rule applicable to the right of stoppage in transitu had its origin in early English Courts, and has been applied by both Federal and State Courts.

"The doctrine of stoppage in transitu, as established in the United States since their independence, accords in general with the principles of the law of England on the subject. 'The English law,' says Chancellor Kent, 'on the subject of this right, and the class of cases by which it is asserted and established, have been very generally recognized and adopted in our American Courts'." Benjamin On Sales, 5th Ed., p. 390.

There is little conflict in the definition of the general rule but divergence in its application to particular facts.

The rule is as follows:

"One who sells goods on credit to another has the right to resume the possession of the goods while they are in the hands of a carrier or middleman in their transit to the consignee or purchaser and before they arrive into his actual possession or to the destination which has been appointed for them on the purchaser's becoming bankrupt or insolvent." 24 R. C. L., p. 129, section 399. See also: Notes 7 A. L. R. 1374.

In Ohio the rule is stated in **Calahan, et al v Babcock, et al., 21 Oh St, 281:**

"1. The right of stoppage in transitu is regarded with favor, and the engrafting of further restrictions upon the rule governing it, is not warranted by public policy."

"2. The right of stoppage in transitu is extinguished only by the actual and complete delivery of the goods consigned, to the vendee or to some agent of and for him."

"3. In the absence of an express or implied understanding to the contrary, the employment of a carrier by a vendor of goods on credit, constitutes all middlemen into whose custody they pass agents of the vendor, for their transportation and delivery; until the complete performance of which duty the goods consigned are deemed to be in transitu."

And, on page 293 of the opinion, the Court say:

"Wherefore, until the vendee in person, or his agent under and for him, shall become custodian in possession, neither the transit of the goods nor the vendor's right of stoppage will be held to have terminated."

However,

"As the phrase right of "stoppage in transitu" implies, the right terminates with the transit, and is completely lost by a termination of the transit and an actual or constructive delivery to the buyer. The

courts have frequently recognized the difficulty of laying down specific rules for determining when the transit is ended and thereby the seller's right of stoppage." 24 R. C. L., p. 144, section 415.

The question presented by the facts in the instant case is, when did the transit end? Did the diversion order of the consignee terminate the transit of the goods from the shipper to the consignee? It has been held that even a reconsignment of a shipment and the taking up of the original bills of lading and issuance of new bills, will not interrupt the transit when the shipment is still moving to the consignee or his agent. In Re Nesto, 270 Fed. 503. Cashmore Fruit Growers' Union v Great Northern Ry Co., 270 Pac. 1038.

These cases have applied the rule to extend the transit through what most courts consider a constructive delivery—that is a surrender of the bills of lading accompanied by a new contract of carriage. It is apparent from the authorities quoted hereinafter that some definite agreement must be reached by the consignee and carrier which completely terminates the original contract of carriage, is an assumption of the right to possession by the consignee, and clearly causes the carrier to assume a new relationship to the consignee, other than a carrier from the shipper to the consignee. Some authorities consider the carrier as agent of the shipper. Others hold the carrier as agent of the consignee, but the effect is the same.

"The right to stop the goods may be determined, not simply by delivery to the buyer, but by an attornment of the bailee to the buyer. The nature of the attornment necessarily must be carefully observed At the time when a carrier first receives goods consigned to the buyer the carrier is agent for the buyer, and subsequent recognition of this agency by the carrier in a statement or letter to the buyer would not, it seems, terminate the seller's right to stop. In order to have that effect the attornment must be a recognition of an agency other than one of carrying out the transit between seller and buyer.". Williston on Sales, Vol. 2, 2nd Ed., section 528, p. 1340.

"As to the first question, we are of opinion that the transit was not ended when the plaintiff asserted its right to the lumber. It makes no difference whether the goods are in the hands of the carrier qua carrier, or whether he puts them at the journey's end in a warehouse. In other words, the transit does not terminate until the goods arrive in the possession actual or constructive of the purchaser. Seymour v Newton, 105 Mass. 272, 275. Mohr v Boston & Albany Rd, 106 Mass. 67. Durgy Cement & Lumber Co. v O'Brien, 123 Mass. 12. Inslee v Lane, 57 N. H. 454. So long as the carrier or a warehouseman acting for him is in possession of the goods, he has a lien for the freight or other charges. The purchaser is not in possession or entitled to possession until he discharges the liens, and the right of stoppage in transitu remains. See Benjamin on Sales, (7th Am. ed.) 915, (2), and cases cited.

"While the position of the carrier may be changed to that of bailee or agent for the purchaser of the goods, yet that is a question of an agreement between the carrier and the purchaser. Jackson v Nichol, 5 Bing. N. C. 508. James v Griffen, 2 M. & W 623. Ex parte Barrow, 6 Ch. D. 783. Ex parte Cooper, 11 Ch. D. 68. Kemp v Falk, 7 Ap. Cas. 573, 584. McLean v Breithaupt, 12 Ont. Ap. 383. Callahan v Babcock, 21 Oh St, 281. Jeffris v Fitchburg Railroad, 93 Wis. 250. Symns v Schotten, 35 Kans. 310." Brewer Lumber Co. v Boston & Albany R. R. Co., 179 Mass., 228, 231, 232.

"There has (as observed by Chancellor Kent, 2 Com. 545), been much subtlety and refinement on the question as to the facts and circumstances which would amount to a delivery, sufficient to take away the right; and there is certainly much danger of being lost amid these subtleties and refinements, unless the principle be adhered to that the intermediate act of the vendee, which is to be deemed sufficient to terminate the transitus, must be such as produces an actual and substantial or physical effect upon the condition and destination of the goods." Secumb, Voorhies & Co. v Nutt, etc.. XIV B. Monroe, 53 Ky. 261, p. 264.

The admitted facts in this case are, that the car of apples was still in the hands of the carrier when the notice to stop was given. It was still in the course of transit from the shipper to the consignee, although it had arrived at its new destination. The diversion order effected at Laramie, Wyoming, did not interrupt the continuing transit of the car from the shipper to the consignee; the destination was changed, but the carrier's relation to the consignee remained unchanged, it was still carrying the original shipment to him. The original transit had not ended.

Upon the facts as set forth in the pleadings, the judgment should have been for the carrier, and judgment may be entered here for the plaintiff in error, the judgment

of the Court of Common Pleas being reversed.

CUSHING, PJ, and HAMILTON, J, concur.

## HARTMAN v OHIO NATL BANK

Ohio Appeals, 2nd Dist, Franklin Co

No 1998. Decided Feb 18, 1931

Henry Gumble and John A. Connor, both of Columbus, for Hartman.

Charles S. Krumm, E. J. Schanfarber, James M. Butler, and Claude J. Bartlett, all of Columbus, for Bank.

### THE FACTS ARE STATED IN THE OPINION.

BY THE COURT:

Plaintiffs in error are the beneficiaries under a trust created by Item 1 of the Last Will and Testament of Samuel B. Hartman, who died in 1918.

On the death of Earl S. Davis, who was named trustee under said item, the Probate Court appointed the defendant in error, the Ohio National Bank, trustee. Thereafter the plaintiffs in error, who are more than one-half in number and interest of the beneficiaries under said trust, made application to the Probate Court to remove the defendant in error as trustee. This application was denied. Error was prosecuted to the Common Pleas Court, where the action of the Probate Judge was affirmed, and the cause now comes into this court to reverse the judgment of the Common Pleas Court.

We shall not undertake to state in detail the occurrences in the Probate Court subsequent to the death of Earl S. Davis, leading up to the appointment of the defendant in error as trustee, under Item 1 of the will of Samuel B. Hartman, deceased, but state directly the narrow question,

the answer to which is determinative of this cause.

The regularity or irregularity, validity or invalidity of the appointment of the defendant in error as trustee is not before us. This is a review of the judgment of the Common Pleas Court affirming an order of the Probate Court in refusing to remove the defendant trustee which he had named. The correctness of the judgments of the Common Pleas Court and the Probate Court depends upon the proper construction of §11035 and §11036 GC.

Item 1 of the will of Samuel B. Hartman reads:

"I hereby appoint Earl S. Davis, of Franklin County, Ohio, my executor and trustee to administer my estate and to execute the trusts mentioned in and created by this will; and, in case of his failure to accept and qualify as such executor and trustee, or in case of his resignation, removal or death before the full execution of the trusts herein and hereby created, I hereby confer upon the person or persons who shall lawfully be appointed to act and shall duly qualify as my executor and trustee all of the powers and impose upon such person or persons all of the duties herein and hereby conferred and imposed upon said Earl S. Davis."

Earl S. Davis qualified under this item of the will, and served as trustee until his death.

Sec 11035 GC reads:

"The Probate Court may accept the resignation of any trustee accounting therein, or who has been appointed by it, and shall remove such trustee, he having ten days' notice thereof, for habitual drunkenness, neglect of his duties, incompetency, fraudulent conduct, or because the interest of the trust requires it, or upon the written application of more than one-half of the heirs, or next of kin, or legatees having an interest in the estate controlled by such trustee. The trustee himself is not to be considered an heir, next of kin, or legatee under such proceedings."

Sec 11036 GC:

"No trustee apointed under a will, shall be removed on the written application of more than one-half of the heirs, next of kin, or legatees, as provided in the next preceeding section, unless for good cause."

Our immediate question is encompassed within the term "No trustee appointed un-

der a will," at the very beginning of §11036 GC.

Is the Ohio National Bank as trustee, a trustee appointed under the will?

The briefs of counsel which have come to our attention disclose the most careful and comprehensive analysis and study of the proposition before us. The legislative history of the sections under consideration is traced with meticulous care. Authorities are cited from other states, particularly Pennsylvania, for and against the claim of plaintiffs in error. But one Ohio case is cited, and it is only helpful inferentially.

We, therefore, although having considered all cases cited which we feel could have been helpful in any manner, are forced to determine the question largely by a study of the subject matter involved in the legislation, and the probable purpose in mind in enacting the statutes under consideration.

At the outset, we are convinced that there is uncertainty and indefiniteness in the language "trustee appointed under a will," as employed in §11036 GC.

We briefly discuss the proposition for determination under three headings.

First, the meaning of the will itself.

Second, the probable purpose of the Legislature in enacting §11035-§11036 GC, in the light of the rules of statutory construction, and

Third, the practical effect of judicial determination of the doubtful language under consideration.

First. Item 1 names Earl S. Davis as trustee and gives him definite and specific duties, authority and power, and further provides in the event that he fails to accept and qualify, or, after acceptance resigns or is removed or dies his successor shall have all the powers and be qualified to do all the acts reposed in Earl S. Davis, Trustee

Dr. Hartman and his scrivener are presumed to have acted with the knowledge that the only source from which the appointment of the trustee, provided by Item 1 could come in the event Earl S. Davis did not qualify or after qualification for any reason ceased to act, was the Probate Court.

The item therefore by implication has as definitely provided for a successor to Earl S. Davis as it did for his appointment in the first instance. There is then within the will provision and authority for the naming by the Probate Court of a successor trustee to Earl S. Davis.

We are of opinion that no violence is done to the meaning and purpose of the will itself in saying that the successor to Earl S. Davis though not nominated in is

named by virtue of or under the will of Dr. Hartman.

Second. It is a rule of statutory construction that legislators in the enactment of laws use language in its common and accepted meaning, and if it is desired to express a specific purpose which has theretofore been carried into legislative enactment, will follow the language there employed.

Certain sections of the General Code, practically all of which were in effect when §11035 GC and 11036 GC were last considered by the Legislature are helpful in determining what was in mind when the expression "Trustee appointed under a will" was employed in §11036 GC.

Sec 10605 GC providing when letters testamentary shall issue, uses this language, in part:

"Provided, however, if the executor named in a will be a non-resident of this state, the court may refuse to issue letters testamentary to such person named therein."

Sec 10591 GC providing trustee by will shall give bond,

"Every trustee appointed in a will, before entering upon his duties as such, must execute a bond," etc.

It is evident that the lawmakers in both of these sections were referring to the individual designated by name in the will itself. §10591 GC is especially applicable here, and had it been the purpose to confine the trustee appointed under a will in §11036 GC to a trustee appointed in the will the simple and direct manner of accomplishing this effect would have been to employ similar, or the express language of §11591 GC.

Sec 10595 GC also illustrates the fact that the legislators in enacting §11035 and §11036 GC had appropriate language before them where specific reference was meant to be made to a trustee nominated in or by the will.

This section provides:

"When two or more trustees are appointed by will, to execute a trust, and one or more of them dies, declines, resigns, or is removed, the survivors or remaining trustees or trustee may execute the trust, unless the terms of the will express a contrary intention."

There are other sections which emphasize the thought in mind, but it is not necessary to cite them.

We think it significant and favorable to the action of the Lower Courts that at the time of the enactment of the original Act, 90 Ohio Laws, 368, that portion of the Act which is now carried into the proviso in §11036 GC was inserted by way of amendment. §11036, GC a part of the original Act, applies to all trusts which are administered in the Probate Court. It is suggested that the bill was referred to the Judiciary Committee, which no doubt was composed largely of lawyers. The inference therefore to be drawn is that the language employed was legalistic and met and stood the test of scrutiny of men versed in the law. It therefore seems probable to us that such bodies of men had they purposed to protect from removal without cause by application of a majority of the beneficiaries only the trustee specifically named in or by a will would have used language the meaning of which would permit of no doubt. There is convincing force in the claim that they were dividing the field of trusts into two classes. (1) Those created by will and (2) those arising in any other manner and that the language chosen "Trustee appointed under a will" pertained to the individual who should be appointed in the first class whether expressly named in the will or made necessary by the will and named by the court.

The observations which we make under third heading are general in scope. They do not have particular reference to the trust under consideration. We have not considered in detail the scope of the trust, its provisions, the extent to which discretionary power is vested in the trustee, how its exercise affects the different individuals who are beneficiaries under the trust, that any but the highest motives actuated them in seeking to have a voice in the selection of the trustee, nor do we in any sense infer that the appointed trustee is more capable or better qualified to administer the trust than those suggested to the court. As we understand it, there is not now nor never has been any question as to the qualifications of the trustee named or of the trust companies suggested for appointment as trustee to meet the duties and responsibilities delegated by Item One of said bill.

Third. The very purpose of a testator in creating a trust is to retain control, supervision, and discretion in distribution of the proceeds of the corpus of the trust in a person designated trustee as distinguished from a different, fuller and more liberal use and benefit thereof as desired or determined by those for whom it is created the cestuis que trust.

If a majority of the beneficiaries of a trust created by will can upon written application require the removal of a trustee named to execute the trust, they are given power tantamount to that of appointment of the trustee, whose duty it is to administer the trust according to the purposes of the creator of the trust. Our law makes no direct or express provision empowering the beneficiaries to name or in any way shape the action of the Probate Judge in nominating a trustee of a trust, of which they are to receive the benefit. It is improbable that it is the purpose of the law to accord to them unlimited and unrestricted control of such appointment. It would be clearly within legislative power, and might be equitable, to permit a majority of beneficiaries of a trust to suggest a number of suitable individuals or corporations from which the Probate Judge would be compelled to make selection. But this has not been done, and we would hesitate unless the clear and unequivocal language of the statute required the Legislature meant to permit by indirection, namely, by provision §11035 GC, the accomplishment of that which they could not do by direct action, namely, to require the appointment of a trustee of their own choosing.

The language "a trustee appointed under a will" as commonly used and understood means a trustee named by reason of a trust created in a will. It is broader and more inclusive than the individual who may in the first instance be nominated by the testator.

It is urged that to give to the language the interpretation of the Probate and Common Pleas Courts would not permit less than a majority of the heirs or beneficiaries of a trust by application to remove a trustee even for a good cause. If this be true, there is no injustice brought about by the situation, because the court has full power at any time on its own motion or on the suggestion of any person interested in the trust to remove a trustee for the specific reasons assigned in §11035 GC which are equivalent to good cause.

We are therefore of opinion that there is no manifest prejudicial error in the judgment of the Common Pleas Court in affirming the action of the Probate Court; that the defendant in error is a trustee appointed under the will of Dr. Hartman, and can not be removed upon the application of the plaintiffs in error, except for good cause shown.

The judgment will therefore be affirmed.

(ALLREAD, PJ, HORNBECK and KUNKLE, JJ, concur.)

**FARR, J:**

It is suggested that the claim was first made in this Court by the Insurance Company that the first annual premium had not been paid. In the court below the Insurance Company filed its answer, which was concluded by a general denial, and it is urged that the Company would have no right under such answer to tender the defense which it tendered upon the trial below; That is to say, the non-payment of the first annual premium as a condition precedent to effectuating the policy of insurance.

That does not now become important, for the reason that upon the trial below testimony was offered concerning the non payment of the premium. Objection was made, which the trial court sustained, but later, as disclosed by the Record, testimony was offered and received concerning payment, so that issue now becomes unimportant. It leaves the remaining and important issue in this case as to whether or not the agent, P. M. Moore, had the right to make the settlement which he made with Ritzi, the assured, accept one hundred dollars in cash and receive the note of the assured for $1148.75.

It will be recalled that the Insurance Company sent the policy which in and of its own terms admits the payment of the first year's premium. That would be upon the assumption that at the time of the delivery of the policy payment had been made. Accompanying the policy was the receipt before mentioned, and which was delivered by Moore to Ritzi. It is in due form and for the full amount, $1248.75, signed, as above stated, by the Secretary of the Company, but it had to be counter-signed by Moore, the agent, which was done when the policy was delivered, which was on the 19th day of June, and not until December 9th, 1929, did the Insurance Company make any question about the payment of the premium. At that time the Assistant General Counsel for the Company, and after demand had been made by Ritzi for the payment of the disability installments, wrote him that payment was refused; that his policy was void, and tendered back to Ritzi the $1248.75, which, it will be recalled, was the full amount of the first annual premium. This insurance policy was for the sum of twenty five thousand dollars, carrying a double liability clause in case the assured was killed by an accident. That part of the policy, of course, is not in question here. There was the additional disability insurance provided for in this policy, and the controversy here relates only to the disability insurance. So that the Insurance Company, whatever the situation may have been, waited from June until December 9th, 1929, to disavow the validity of the insurance policy. It waited until after Mr. Ritzi had suffered from his operation and his alleged consequent arthritic condition which followed, and until notified that disability installments would be claimed, before it made any question with anyone with reference to the validity of the policy. It becomes readily apparent that the important question here is whether or not F. M. Moore, as agent for the Company, had a right to deliver this policy and receive the first annual premium upon the terms which were made in the settlement, to-wit, the receipt of $100.00 in cash and the note for $1148.75. If the agent had that authority, the Company was bound. If he did not, of course it would not be so.

A case which is of interest in this connection, and perhaps it is necessary to only have in mind for consideration the Ohio cases upon this subject, is **Machine Company v Insurance Company, 50 Oh St, 558.** In the opinion of the court by Williams, J, it is said:

"The only other ground upon which it

638

is claimed the defendant is not liable is, that the premium was not paid until after the loss occurred."

That is not the situation in this case. If the premium was paid, it was paid before the illness of Ritzi. It is further observed that:

"Murphy was the duly commissioned agent of the defendant, authorized to make contracts of insurance, collect premiums, and issue and renew policies; and, to that end, was furnished by the defendant with printed forms of policies, signed in blank by the president, and secretary of the company, to enable him, without conference with them, to countersign and issue the policies in behalf of the company. It is well settled that such an agent is the general agent of the company, and may, in his dealings with those he insures, waive payment in cash, of the premiums, and, indeed, any of the conditions of the policy except when a restriction upon his authority is in some way brought to the knowledge of the insured."

In the instant case no knowledge whatsoever of any restriction on Moore's authority was brought home to Ritzi. He was permitted to believe that Moore had full authority in this matter, because months before he had closed this transaction with Moore, received the receipt, executed his note, and never until the end of that year did the Insurance Company complain. Continuing, it is said that:

"In a recent and valuable work on insurance it is said that a fire policy does not ordinarily make the payment of the premium a condition precedent to the validity of the contract, and a general agent may of course extend credit to the insured, or not, as he chooses."

But, what is the difference? In the instant case this policy provided for payment of the annual premium at the time of the delivery of the policy. It likewise provided within and of itself a receipt for that annual premium, leading the assured to believe that the transaction with the agent was valid and effective. It is said further that:

"The general custom where credit is given, is for the agent to do so on his own responsibility. But in case the agent should make default in accounting to the company, the policy will nevertheless be valid. And though the policy provide that it shall not take effect until the premium is paid in cash, the general agent has power to waive the premium, and will be held to have waived it if he delivers the policy without enforcing payment. Richards on Insurance, Section 95. And in Section 93 of the same work, that author says: "An agent of a life company who is intrusted with the business of closing the contract by delivering the policy is held to have an implied authority to determine how the premium then due shall be paid, whether by cash, or, as is sometimes done, by giving credit, in which case the agent becomes the creditor of the insured, and the debtor of insurer. In that event, though the agent subsequently defaulted and the money never reached the company, the policy would still be binding. By the weight of authority the agent is held to have this discretionary power, although the policy in terms denies it; but this is based upon his possession of the document for purposes of delivery, and his instructions to deliver it, and consequently his power does not extend to subsequent premiums or premium notes.' Bodine v Insurance Company, 51 N. Y., 117. The authorities on this subject are extensively collected in that very convenient and almost indispensable work, The American and English Encyclopedia of Law, Vol 11, page 333. The waiver of the payment of the premium in cash, is an act within the exercise of the agent's general authority to issue policies and collect the premiums, and such waiver may be either express or implied."

What has just been read would be sufficiently determinative of the important issue here, but an additional case, and which directly reflects upon this issue, is that of Smith v Savings Life Assurance Society, 8 O. F. D. 417. The first proposition of the syllabus is upon the proposition and in harmony with that which has just been read from the opinion of Williams, J, in the case to which reference is above made.

It is not now necessary nor would it be profitable to continue this discussion further. It is worthy of note that the opinion in the case in the 3 Ohio Fed. Dec., is by the late Chief Justice Taft when a member of the Circuit Court of Appeals of the United States. It is a well reasoned and able opinion, as might be expected under the circumstances, and adheres to the principles laid down by Williams, J., in the 50th Ohio State case.

Without further discussion, it is quite sufficient to say that for the reasons given the judgment in the instant case is affirmed.

ROBERTS and POLLOCK, JJ, concur.